**R. J. LALLIER TRUCKING, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 76-1829.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1977.

Decided July 20, 1977.

William C. Hoffman, St. Paul Minn., for petitioner.

Joseph Ferrara N. L. R. B. Appellate Court Branch, Washington, D. C., for re-spondent; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, El-liott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Washington, D. C., on brief.

Before LAY and HENLEY, Circuit Judges, and NANGLE, District Judge.*

HENLEY, Circuit Judge.

R. J. Lallier Trucking, an individual pro-prietorship owned and managed by Ray-mond J. Lallier of St. Paul Minnesota, has brought this direct petition for review of an order of the National Labor Relations Board directing petitioner to cease and de-sist from certain unfair labor practices pro-scribed by § 8(a)(1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(1) and (3), to reinstate with back pay and without loss of seniority a dis-charged employee, Gerald Garrity, and to post appropriate notices of compliance. The Board has cross-petitioned for enforce-ment of its order. We have jurisdiction by virtue of § 10(f) of the Act, 29 U.S.C. § 160(f).

Petitioner is engaged in the business of commercial hauling in and around St. Paul, and it owns and operates a small fleet of trucks; its principal customers are North-ern States Power Co. and Minnesota Mining & Manufacturing Co. During 1974 and for most of the first half of 1975 petitioner employed four truck drivers, including Garrity and Robert Bauerfeld. Three of the four drivers operated petitioner's trucks under written lease agreements. Garrity had no written lease but was operating

---

* The Honorable John F. Nangle, United States District Judge, Eastern District of Missouri, sit-ting by designation.

under what the parties considered to be an oral lease; he was compensated on the same basis as were the other drivers. Prior to late May or June, 1975, the drivers were not represented by any labor union as their collective bargaining agent.

Petitioner's business is seasonal, and its busy season runs from about October 1 of a given year to about April 15 of the following year. Petitioner is able to operate at least one truck on a twelve month basis, but during the slack period of each year the employment of the drivers by petitioner is sporadic. Although no collective bargaining agreement was in force during the period with which we are concerned, it appears that petitioner would call drivers to work during slack periods on the basis of seniority. If, as happened on several occasions with respect to Garrity, a driver was discharged for any reason, he lost his seniority, and would be at the bottom of the list if he was rehired.

The controversy presented here arose when on March 31, 1975 Local Union 221 of the Construction, Building Materials, Ice and Coal Drivers and Helpers and Inside Employees, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, hereinafter called the Union, applied to the Board for the calling of a representation election to determine whether it was the desire of a majority of the four drivers that the Union become their collective bargaining agent.

Lallier was evidently of the view that should his operation be unionized, the existing lease arrangement between it and the drivers would have to be scrapped, and that unionization would increase petitioner's operating costs and might result in loss of work by the drivers.

Petitioner opposed the calling of the election contending that the drivers were independent contractors and were not employees. The Board held a hearing on April 16, 1975 and rejected that contention which is not in issue here.

The election was held on May 28, and the Union prevailed by a vote of three to one.

Garrity, Bauerfeld and another driver, Stromberg, voted for the Union. The fourth driver, Frank Tschida, voted against it. Immediately after the election Mr. Lallier, who appeared to be angry at the results, made certain remarks to Bauerfeld, Garrity and Stromberg.

On the morning of June 2, 1975, four days after the election, Tschida at Lallier's direction contacted Garrity by telephone and asked him if he could report for work on an excavation job in St. Paul, probably within the next hour or so. Garrity advised Tschida that he had other plans for the day and would not be able to report. When Lallier learned of this, he immediately discharged Garrity by means of a letter which was sent to Garrity by certified mail. The letter gave as the sole reason for the discharge the fact that Garrity had refused to report for work on that day. No reference was made to the fact that on two previous occasions Garrity had been discharged for being late to work, and that in November, 1974 he had been discharged for drinking on the job. On each of those occasions Garrity had been rehired but with loss of seniority. Garrity was last reemployed in February, 1975, but it appears that between the date of his rehiring and the date of his discharge he had actually worked on only about seven days.

On the evening of June 9 Lallier contacted Bauerfeld and directed him to report for work on the following morning. Bauerfeld did so, but he arrived late, found no one on petitioner's business premises and went home. Immediately thereafter he secured a full time job as a guard at the Minnesota State Prison. In late June Lallier contacted Bauerfeld and inquired whether he considered himself still to be employed by petitioner. Bauerfeld indicated that he did not; Lallier then directed Bauerfeld to surrender certain keys that were in his possession, and Bauerfeld presumably did so.

It will have been observed that the episodes involving both Bauerfeld and Garrity occurred during the 1975 slack season. When petitioner's busy season began in the fall of 1975 petitioner made no effort to

recall Bauerfeld to work. Bauerfeld did not long retain his job at the prison; during most of August and September, 1975 he worked for two other trucking companies, but in each instance his employment was terminated prior to the expiration of his thirty day probationary periods.

Apparently the Union was duly certified as the bargaining agent for petitioner's drivers, but by agreement between petitioner and the Union collective bargaining negotiations were postponed until the fall of 1975. We are not apprised as to whether a contract between petitioner and the Union was ultimately negotiated.

In October, 1975 unfair labor practice charges against petitioner were filed with the Board, and the Board issued its complaint in December. It was charged in substance that on two occasions prior to the election of May 28 Lallier in his management capacity had made threatening anti-union statements to his drivers and had made similar statements immediately after the election, and that the statements constituted violations of § 8(a)(1) of the Act. It was further charged that the discharge of Garrity was on account of his pro-union activities and was in violation of § 8(a)(3) and (1) of the Act. A similar charge was made with respect to Bauerfeld on the theory that the failure of petitioner to call him back to work at the beginning of the busy season of 1975 constituted an unlawful discharge in retaliation for his support of the Union.

Petitioner denied the charges. With respect to the statements made to the employees petitioner contended that they were protected by the first amendment to the Constitution of the United States as implemented by § 8(c) of the Act. As to Garrity, petitioner contended that he was not discharged for having supported and voted in favor of the Union but because of his failure to report for work on June 2. Petitioner denied that it had ever discharged Bauerfeld and asserted that Bauerfeld had simply quit his employment with petitioner and had gone to work for other employers.

The case was assigned to an administrative law judge who held an evidentiary hearing in February, 1976. In late April, 1976 the judge submitted his decision and recommended order. The charge that Bauerfeld had been discharged unlawfully was dismissed. The other charges were sustained.

Petitioner excepted to the decision and the recommended order. In August, 1976 the Board adopted the decision of the administrative law judge as its own and also adopted the recommended order. The instant proceedings were then timely commenced in this court.

In pertinent part the Board's order is as follows:

Respondent, R. J. Lallier Trucking, its officers, agents, successors, and assigns, shall:

1. Cease and desist from:

(a) Discharging, or otherwise discriminating against employees in regard to hire or tenure of employment, or any term or condition of employment because of their union or protected concerted activities.

(b) Threatening employees with loss of work, layoff or reprisals because of their union activities or protected concerted activities.

(c) In any other manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act except to the extent that such rights may be affected by lawful agreements in accord with Section 8(a)(3) of the Act.

2. Take the following affirmative action which it is found will effectuate the policies of the Act:

(a) Offer to Gerald M. Garrity immediate and full reinstatement to his former position or, if such position no longer exists, to a substantially equivalent position, without prejudice to his seniority or other rights previously enjoyed, and make him whole for any loss of pay or other benefits suffered by reason of the discrimination against him. . . . .

Petitioner contends here, as it did before the agency, that the statements made by Lallier both before and after the election were protected by the first amendment and by § 8(c) of the Act, and that the discharge of Garrity was justified and did not amount to discrimination or retaliation against him on account of his support of the Union.

Section 10(f) of the Act requires us to accept the factual findings of the Board, that is to say the findings of the administrative law judge which the Board adopted, if they are supported by substantial evidence on the record considered as a whole. And we are required to keep in mind that it is the function of the Board, and not of this court, to pass upon questions of the credibility of witnesses and the weight to be given to their testimony, and that the Board is free to draw such reasonable inferences as may be warranted by the evidence. *N.L.R.B. v. Fremont Mfg. Co.*, 558 F.2d 889 (8th Cir., 1977); *N.L.R.B. v. Melrose Processing Co.*, 351 F.2d 693, 698 (8th Cir. 1965).

We take up, first, the propriety of the Board's finding with respect to the discharge of Garrity.

Evidence of record abundantly establishes that for economic reasons petitioner did not want to have to deal with the Union as the collective bargaining agent of the drivers, and that Mr. Lallier made his position known to the drivers. The evidence also clearly establishes that Garrity, to the full knowledge of Lallier, had supported the Union and voted in its favor, and that he had been discharged only four days after the election ostensibly for refusal to report for work although the call to work came during the slack season and even though Garrity had offered an excuse for his refusal which might well have been an acceptable one.

When an employee is discharged very shortly after marked pro-union activity in an establishment or plant the management of which is opposed to unionization, the inference may be warranted that the discharge was due to the employee's union activity, and that the ostensible reason for the discharge put forward by the employer was but a pretext. *N.L.R.B. v. Fremont Mfg. Co., supra; N.L.R.B. v. Broyhill Co.*, 514 F.2d 655, 658–60 (8th Cir. 1975). However, such an inference is not invariably called for and is not always warranted. See *Sinclair & Valentine Co. v. N.L.R.B.*, 549 F.2d 1183 (8th Cir. 1977).

In *N.L.R.B. v. Superior Sales, Inc.*, 366 F.2d 229 (8th Cir. 1966), this court laid down a number of guidelines to be considered in determining in a case like this whether the discharge of the employee in question was discriminatory and amounted to an unfair labor practice. We said (366 F.2d at 233):

Before discussing the discharge involved in this case perhaps we should state some principles which are followed in any unlawful discharge action. The court is aware: (1) that the mere synchronism of the discharge and the employee's union activities without more will not establish a discriminatory motive for the discharge, . . .; (2) that the existence of a non-prohibited reason for discharge does not negate a violation of the Act if the discharge is actually for a different and prohibited reason, . . .; (3) that an unlawful purpose for the discharge is not lightly to be inferred, . . .; (4) however, a violation may be proved by circumstantial evidence, . .; (5) that although a general bias or hostility toward the union does not supply the element of purpose, they are proper and highly significant factors for Board evaluation in determining motive, . . .; and (6) that the burden of proving violations of the Act is on the General Counsel, . . .. [Citations omitted.]

In his full opinion the administrative law judge discussed the facts leading up to, surrounding and following the discharge of Garrity in great detail. No useful purpose would be served by copying or paraphrasing relevant portions of the opinion. In substance, it was found that the control exercised by petitioner over its drivers during slack seasons was extremely loose, and that there was no fixed policy or requirement that they remain on call or report for duty

when called if it was not convenient for them to do so, and that an employee suffered no adverse consequences if he could not be located when called. And the judge concluded that Garrity would not have been discharged on June 2 except for his union activity and for the fact that he had voted for the Union.

While we think that the case made against petitioner as far as Garrity was concerned was weak and that the decision might well have gone the other way, we cannot say that the administrative finding was arbitrary or capricious or that it was not supported by substantial evidence on the record as a whole.

We turn now to the finding of the Board that petitioner impermissibly threatened his drivers with loss of work if the business should be unionized. That finding is based on three episodes: 1) a meeting that was held in petitioner's home either before or after the representation petition had been filed by the Union but in any event prior to the hearing that the Board conducted on April 16; 2) a private conversation between Lallier and Bauerfeld on May 21, 1975, a week before the election; and 3) statements made by Lallier to Garrity, Bauerfeld and Stromberg on May 28, immediately after the election. While there is some conflict in the testimony as to what Lallier said on those occasions, we will accept the administrative law judge's findings as to the contents of Lallier's statements.

With respect to the first occasion the judge found that Lallier told the drivers that when he bid a job, he knew how much he was paying his men; that their pay had been raised in January "when he went on a per ton basis"; that he would look at the financial situation again if the men remained under the existing lease agreement; but that if he was required to execute a contract with the Union he would have to take another look at the contract and "see if there were enough profit to stay in the business." Petitioner then asked each of the men which course he preferred to follow. Three of the men indicated that they desired to continue under the lease arrange-

ment. Garrity, who had no written lease agreement, asked what would happen if he did not sign a lease; he was told that if he did not sign a lease "he wouldn't work." Garrity then told Lallier that he was in doubt and wished to consult his lawyer, and that he preferred "going with the Union rather than the lease arrangement."

As to the second occasion, the judge accepted the testimony of Bauerfeld to the effect that Lallier picked him up where he was working and drove to an establishment on Payne Avenue where the men had coffee. According to Bauerfeld, Lallier stated that he wanted to continue to operate under the lease arrangement and did not "want to go union." Lallier also said that the decision was up to the drivers, but that if they continued under the existing arrangement they probably would "work the year round." Lallier also said that if the vote went in favor of the Union, the men would probably just work during cold weather, and that they should think the matter over.

The judge found that on the third occasion Lallier, who appeared angry, told Garrity, Bauerfeld and Stromberg that petitioner "would continue using its trucks on the Northern States Power job, that he did not need to run them other than for the Northern States Power job, and that the trucks would otherwise sit for the summer." The judge also found that the employees asked Lallier about the use of seniority in determining who would work, and that Lallier replied that "it was his company and he would determine who worked and who did not work."

Section 8(c) of the Act provides that: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions [of the Act] if such expression contains no threat of reprisal or force or promise of benefit."

The extent of the protection afforded to an employer by § 8(c) was discussed in detail in the leading case of *N. L. R. B. v.*

*Gissel Packing Co.*, 395 U.S. 575, 616–20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and has been considered in numerous opinions of this court, including *e. g.*: *N. L. R. B. v. Dixistell Buildings, Inc.*, 445 F.2d 1260 (8th Cir. 1971); *N. L. R. B. v. Douglas & Lomason Co.*, 443 F.2d 291 (8th Cir. 1971); *N. L. R. B. v. Crystal Tire Co.*, 410 F.2d 916 (8th Cir. 1969); and *N. L. R. B. v. Louisiana Mfg. Co.*, 374 F.2d 696 (8th Cir. 1967). The governing principles are adequately stated in those cases and in others that might be cited and need not be restated here in any detail.

While § 8(c) was passed in recognition of the fact that employers as well as employees have a constitutionally protected right of free speech and expression, it must be recognized that where an employer addresses his employees in opposition to the unionization of his plant or business, he will do well to be circumspect in his utterances and careful in his choice of words. And he should be particularly careful if he not only expresses his opposition to unionization but also goes further and purports to predict the adverse effects that unionization may have on his business, his employees, and their incomes or work opportunities.

A challenged statement by an employer must be appraised in the context of its particular labor relations setting. An employer's right of expression must be balanced against the equal rights of employees to associate freely within a collective bargaining setting. And any balancing of those rights must take into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *N. L. R. B. v. Gissel Packing Co., supra*, 395 U.S. at 617, 89 S.Ct. at 1942.

In *N. L. R. B. v. Crystal Tire Co., supra*, 410 F.2d at 918, we said:

> . . . The effect of the employer statements must be judged in the light of circumstances in which words innocent in and of themselves may be understood as

threats. . . . Words though coercive in meaning may neither be so intended nor have that effect. Such issue is generally one of fact for the Board's initial consideration. . . .

The statements made by Lallier immediately after the election were relevant to the extent that they shed light on his later conduct with respect to Garrity and Bauerfeld, but we do not consider that in and of themselves they constituted any violation of § 8(a)(1). They were simply an angry outburst by Lallier which could not affect the result of the election, and they obviously did not frighten either Garrity or Bauerfeld.

The situation with respect to Lallier's pre-election statements is somewhat different. Considered together, the two statements that were made prior to the election may not unreasonably be construed as representations by Lallier that if the Union won the election the drivers would automatically lose work regardless of what demands the Union might make and regardless of the terms of any contract ultimately agreed upon, but that if the Union lost the drivers would continue to have as much work as they already had or perhaps more or even that they might receive somewhat higher compensation than they were receiving.

Although the § 8(a)(1) case was a weak one, just as was the § 8(a)(3) and (1) case based on the discharge of Garrity, we are not prepared to say that the Board could not permissibly find that the pre-election statements amounted to threats or promises and were unfair labor practices.

The petition for review is denied. The cross-petition for enforcement of the Board's order is granted in its entirety.